IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CIVIL ACTION NO: _____

MORGAN DUNN,

Plaintiff,

v.

JANE MICELI, M.D. and
EATING RECOVERY CENTER, LLC,

Defendants.

---

**PLAINTIFF'S ORIGINAL COMPLAINT, JURY DEMAND
AND CERTIFICATE OF REVIEW**

---

Morgan Dunn ("Plaintiff") through counsel complains of Jane Miceli, M.D. ("Miceli") and Eating Recovery Center, LLC ("ERC") and requests a trial by jury, as follows:

## PARTIES

**1.** Morgan Dunn, Plaintiff is a resident of Dallas County, Texas.

**2.** Jane Miceli, M.D. ("Miceli") is a resident of the State of Colorado.

**3.** Eating Recovery Center, LLC ("ERC") is a limited liability company incorporated under the laws of the State of Colorado with its principal place of business located at 7351 East Lowry Boulevard, Suite 200, Denver, Colorado 80230.

**4.** Miceli and ERC may also be referred to collectively as Defendants.

## JURISDICTION AND VENUE

**5.** The District of Colorado has jurisdiction over this matter pursuant to 28 U.S.C. § 1332. There is complete diversity of citizenship between Plaintiff and Defendants. In addition, this Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

**6.** Venue is proper in this Court under 28 U.S.C. § 1391 in that Defendants are residents to the State of Colorado, conduct a substantial amount of business in this District, and a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this district.

## STATEMENT OF FACTS

**7.** In the latter half of 2010, Plaintiff began to lose a significant amount of weight. On or about January 9, 2011 while at a Cinemark Theater, Plaintiff became dizzy and while walking out of a theater, passed out, fell and fractured her jaw. Plaintiff began to receive treatment from a nutritionist and counselor regarding her eating disorder issues.

**8.** On March 9, 2011, Plaintiff was admitted into Children's Medical Center of Dallas and was diagnosed with various eating disorders, including as suffering from Anorexia Nervosa, Bulemia and/or Eating Disorders Not Otherwise Specified as those terms were defined in the DSM-IV-TR[1]. Plaintiff was in Children's in-patient hospitalization program full time from March 9, 2011 through April 8, 2011. Plaintiff was released from the program at Children's in June of 2011 but still required and received on-going counseling and treatment.

**9.** Thereafter, Plaintiff's condition worsened to a level requiring additional treatment for her eating disorder symptoms. Beginning on January 16, 2012, Plaintiff was admitted into the intensive outpatient program ("IOP") at the Renfrew Clinic in Dallas, Texas. IOP consisted of meeting several days a week and included group therapy and meals.

**10.** Plaintiff's symptoms not only persisted but also began to worsen and she did not make progress in the intensive outpatient program in which she was placed. Therefore Plaintiff was placed in a day treatment program at Renfrew necessitating her daily attendance. Plaintiff's symptoms continued and outside of the Renfrew program, Plaintiff continued to be severely afflicted.

---

[1] The DSM-IV-TR was subsequently superseded by the DSM-V which was published on May 18, 2013 at the American Psychiatric Association's Annual Meeting.

**11.** In or about April of 2012, Plaintiff's condition deteriorated requiring increasing levels of medical attention. To this end, the Renfrew Center recommended Plaintiff's level of care to include a "residential program."

**12.** Thereafter, on or about May 9, 2012, Plaintiff was admitted into the Texas Health Presbyterian Hospital of Dallas for treatment of her various eating disorders. Plaintiff attended Presbyterian each day until June of 2012. Plaintiff was discharged from Presbyterian, not because of improvement in her health, but due to coverage decisions made by Plaintiff's insurance carrier. Subsequent to her discharge, Plaintiff's health consistently eroded; and her physical state continued to deteriorate.

**13.** On or about September 6, 2012, Plaintiff went to Timberline Knolls to begin her round of residential treatment. She remained at Timberline Knolls for approximately three weeks. However, based upon the recommendation from United Behavioral Healthcare ("UBH"), Plaintiff required a higher standard of care and she was sent to the Alexian Brothers Health Center in Chicago, Illinois.

**14.** Plaintiff remained at Alexian Brothers for approximately three weeks while undergoing treatment for eating disorders not otherwise specified ("EDNOS"). UBH conducted weekly reviews. Thereafter, UBH made the determination to send Plaintiff to Defendant ERC in Denver, Colorado for continued treatment of her eating disorders. Plaintiff arrived at ERC on or about October 22, 2012. Miceli is listed as the Medical Director of Adult Inpatient and Residential Services for ERC and ERC represents Miceli to be an expert in the field of eating disorders on ERC's website.

## Treatment at ERC

**15.** Upon her admission to ERC, Miceli's admitting diagnosis for Plaintiff was "Anorexia nervosa-binge/purge type, Major depression, moderate, Obsessive compulsive disorder,

Generalized anxiety disorder, PTSD." Miceli's Admission Assessment did not make any notation of drug dependency issues. Plaintiff's History & Medical Admission Report also did not note any issues with drug dependency issues. Plaintiff's BioPsychoSocial Assessment did not note any issues with drug dependency issues.

16.     Treatment of eating disorders typically includes a combination of psychological counseling, nutrition education, medical monitoring and sometimes, medication. Recent studies completed at the University of Texas Southwestern Medical Clinic indicate persistent, on-going psychological counseling can positively impact the brain of a person suffering from various eating disorders. However, Miceli's treatment program for Plaintiff included as a major aspect, the usage of prescription drugs in varying doses.

17.     Miceli's prescription drug regiment for Plaintiff became inconsistent, was contradicted on several occasions by later orders and resulted in Plaintiff becoming dependent on narcotic prescription drugs. For example, on October 23, 2012, Miceli noted that Plaintiff's medication included:

"clonazepam 1 mg disintegrating tablet – 1 Tablet 3 times per Day, by mouth before meals for anxiety, Start date: Oct 23, 2012 for one year.

clonazepam 0.5 mg disintegrating tablet – 1 Tablet, 1 time per day, by mouth as needed for anxiety, Start date: Oct. 23, 2012 for 1 Year."

18.     However, under the Plan Procedure Orders from that same date, Miceli noted, "Discontinue Medication, stop clonazepam 1 mg tablets before meals for anxiety."

19.     Despite Miceli's note about "Discontinue Mediation, stop clonazepam" on October 23, 2012, Plaintiff's treatment plan dated October 25, 2012, revealed that in fact, Miceli contradicted her prior order and increased Plaintiff's dosage of clonazepam to 2 mg three times a day.

**20.** On October 29, 2012, Plaintiff's dosage of clonazepam remained at 6 mg per day and in addition, Miceli also prescribed 10 mg of diazepam. At the same time, Miceli also prescribed Zyprexa Zydis, an anti-psychotic drug.

**21.** On November 5, 2012, Plaintiff was prescribed a one day, 1 mg dose of alprazolam. At that time, Plaintiff's records indicate that her treatment plan was to taper her off valium and transition her from clonazepam to alprazolam. On November 6, 2012, Plaintiff's records indicate that the treatment plan approved by Miceli was to "Discontinue Medication, stop clonazepam 2 mg before meals for anxiety, stop diazepam 10 mg at bedtime."

**22.** The next day instead of waiting to determine the effectiveness of a transition to alprazolam, Miceli again contradicted her prior order and changed Plaintiff's drug treatment to:

clonazepam 2 mg disintegrating tablet – 1 tablet three (3) times per day, by mouth before meals for anxiety, Start date: Nov 7, 2012 for one year;

clonazepam 1 mg disintegrating tablet – 1 tablet one (1) time per day, by mouth at bedtime for anxiety, Start date: Nov 7, 2012 for one year;

clonazepam 1 mg disintegrating tablet – 1 tablet one (1) time per day, by mouth as needed for anxiety, Start date: Nov 7, 2012 for one year;

Therefore, just one day after Miceli issued orders to transition Plaintiff off of clonazepam, not only did she reverse her orders but increased the dosage level of clonazepam.

**23.** With Plaintiff's medications needlessly increasing, which resulted in her ever-increasing dependency on these medications, on or about November 7, 2012, UBH made the determination that it was stopping coverage for all treatment for eating disorders and mandated that it would only extend coverage for a detox program for Plaintiff. ERC appealed this determination and the following day, UBH approved an additional stay until November 13, 2012, to allow ERC to begin a detox and titration program for Plaintiff.

24.     On November 9, 2012, Miceli had actual knowledge that UBH had indicated that coverage for Plaintiff's eating disorder treatment was going to be terminated, that Plaintiff had been overmedicated and became dependent on narcotic medication and she was going to be discharged.  With this information, Miceli knew that Plaintiff needed to be titrated off clonazepam and have its administration overseen by a trained medical professional. Nonetheless, Miceli continued to subject Plaintiff to 6 mg of clonazepam per day with the latest review of her medications occurring on November 12, 2012.  Plaintiff was discharged to her parents' care on approximately November 13, 2012.

25.     Upon Plaintiff's discharge, Miceli had actual knowledge that UBH's staff doctors and oversight personnel had determined that Plaintiff required a detox program and placed this as a priority over her eating disorder issues. Despite this information, ERC and Miceli discharged Plaintiff, unsupervised, on a Super Shuttle transport to Denver International Airport with a large, clear, plastic bag filled with her medications, including but not limited to, numerous doses of the narcotic medication, clonazepam.  This medication was not limited to doses intended to last only for a limited number of days until such time as a trained, licensed medical doctor could oversee her medication and continue her very difficult program to titrate her off of these medications.

### Post-ERC hospitalization and treatment

26.     The inevitable damage resulting from Miceli's professional negligence first manifested itself on or about November 15, 2012.  On or about said date, Plaintiff had to be rushed to the emergency room at Presbyterian Hospital in Plano, Texas because of an overdose of clonazepam. Plaintiff's vital signs were erratic, she was lethargic and was generally not responsive to stimuli. Plaintiff was placed in the Intensive Care Unit. At no time prior to her "treatment" at ERC did Plaintiff ever require emergency room hospitalization for usage of prescription drug or any other substance.

27.     After Plaintiff's health was stabilized enough so that she could travel, on or about December 17, 2012, Plaintiff once again went to the Timberline Knolls Center in Lemont, Illinois for treatment. After ten days, Timberline Knolls' staff psychiatrist, noted that Plaintiff "… continues to demonstrate medication-seeking behaviors by complaining of anxiety and discomfort and requesting pain medications or benzodiazepines to 'help me relax.'" At no time prior to Miceli's "treatment" had Plaintiff expressed medication-seeking behaviors and ERC's own notes and records do not indicate this pattern of conduct, save and except in her Discharge and Transition Summary. Nonetheless, she remained in treatment at Timberline Knolls until January 30, 2013 when she returned to Dallas.

28.     Plaintiff's dependency on narcotic and prescription drugs continued to haunt her and impede her recovery from her severe eating disorders. On February 1, 2013, Plaintiff again overdosed on the prescription drugs she had received from her treatment provider. She was again rushed to Presbyterian Hospital in Plano, was admitted to the Emergency Room and then, to the Intensive Care Unit. These incidents of pharmaceutical drug addictive issues, hospitalizations and near death experiences only occurred after leaving ERC and after Miceli's "treatment."

29.     Plaintiff started again in the eating disorder program at Texas Health Presbyterian Hospital of Dallas and was in this program on a daily basis until March 2013. Afterwards, she transitioned into a Dialectical Behavioral Therapy ("DBT") program in Dallas, Texas.

Plaintiff remained in the DBT program in addition to being seen by an outside counselor and various doctors. However in part because of her continued dependence on medication, Plaintiff's health continued to deteriorate.

30.     As a result, in late June 2013, Plaintiff was again taken to the emergency room at Dallas Presbyterian Hospital. She was hospitalized for an additional 4 days for on-going care and treatment.

31.     Thereafter, on or about July 16, 2013, Plaintiff agreed to go to the Dove Tree Ranch Facility in Lubbock, Texas for on-going care and treatment. Because her health condition continued to deteriorate and her ability to attempt to recover from her eating disorders was being exacerbated by her dependency on benzodiazepines, she was required to spend two days in the intensive care unit at the University Medical Center in Lubbock, Texas and effective July 23, 2013 she was readmitted back into the Dove Tree Ranch Facility for on-going care and treatment.

32.     Thereafter, beginning in or about August of 2013, Plaintiff spent approximately 6 weeks at the Rosewood Center in Wickenburg, Arizona. Upon her return to Dallas, beginning in late September through November 2013, Plaintiff was under the care and treatment of two medical providers, including Dr. Stephanie Setliff[2], a psychiatrist/counselor and another counselor in Dallas, Texas.

33.     In or about December 2013, Plaintiff was sent to the Acute Eating Disorder Center in Denver, Colorado for medical stabilization. She remained there until approximately December 27, 2013 when she was moved to Monte Nido Rehabilitation Facility in Los Angeles, California. However, Plaintiff's health was not stable enough to remain at that facility and in mid January 2014, she was transferred to the BHC/Reasons Hospital in Rosemead, California.

34.     Plaintiff remained at BHC/Reasons until June of 2014 whereupon she returned to Dallas, Texas. BHC/Reasons was successful in transitioning and then removing Plaintiff from all benzodiazepines and addictive substances.

---

[2] Dr. Setliff is now the medical director at the Eating Recovery Center in Dallas, Texas. No allegations are directed at Dr. Setliff.

## Causes of Action

### Claim for Relief as to Miceli

### MEDICAL NEGLIGENCE

35. The preceding paragraphs are incorporated the same as if fully set forth herein.

36. Plaintiff was under the care and treatment of Miceli in 2012. With respect to her care and treatment of Plaintiff, Defendant Miceli owed Plaintiff a duty to exercise that degree of care, skill, caution, diligence, and foresight exercised by and demanded from physicians in like and similar situations.

37. In the State of Colorado, a physician employed to treat a patient contracts with her patient that:

(1) she possesses that reasonable degree of learning and skill which is ordinarily possessed by others of the profession;

(2) she will use reasonable and ordinary care and diligence in the exercise of her skill and the application of her knowledge to accomplish the purpose for which she is employed; and

(3) she will use her best judgment in the application of her skill in deciding upon the nature of the injury and the best mode of treatment.

38. Defendant Miceli deviated from the standard of care required and was negligent in her care and treatment of Plaintiff including but not limited to, the following:

1. Failing to properly treat, evaluate, diagnose, monitor and follow the care and treatment of Plaintiff;

2. Started Plaintiff on a program of becoming dependent on dangerous, psychotropic and/or addictive medications;

3. Increased the dosage of said medications to a dangerous and improper level for a person of Plaintiff's physiological and psychological make up;

4. Improperly relied upon addictive, prescription medication as a primary source for the treatment of eating disorders in an alleged eating disorder program;

5. Although receiving actual knowledge that UBH was refusing to extend coverage for future treatment addressing her eating disorders but would only cover a detox program, failed and refused to immediately institute a program to titrate Plaintiff off of clonazepam;

6. Discharged Plaintiff with an impropriate number of addictive medications in dangerous levels which said medications were simply thrown into a plastic bag for her to take home;

7. Failed to properly coordinate with Plaintiff's treating physicians and counselors in Dallas to insure that her medications were being given properly and appropriately.

39. Miceli's conduct was a proximate cause of actual damages to Plaintiff in an amount to be determined by the jury at trial. Such damages include, but are not limited to, past and future medical and health care bills, economic damages, mental anguish, emotional distress, pain and suffering and other similar injuries and damages.

### Claim for Relief as to ERC
### COLORADO CONSUMER PROTECTION ACT
### C.R.S. § 6-1-101 ET SEQ

40. At all material times, Plaintiff was a consumer of ERC's actual and promised services. As such, Plaintiff brings this cause of action against ERC pursuant to the Colorado Consumer Protection Act, C.R.S. § 6-1-101 *et seq*. ["CCPA"]

41. ERC, through the wide dissemination of their marketing and advertising materials through its dedicated website, the internet and upon information and belief, through printed media widely distributed, engaged in intentional violations of the CCPA, C.R.S. § 6-1-101 *et seq*.

42. In particular, ERC made knowingly false promises and false representations regarding the services to be provided to ERC's consumers, including Plaintiff, in violation of CCPA, C.R.S. §§ 6-1-105. ERC advertises itself to the public through its website as an international center for eating disorders. ERC advertises that "Eating Recovery Center's treatment philosophy is rooted in not only individualized assessment and clinical intervention for eating disorders, but

also aftercare planning." ERC represents "The multidisciplinary treatment team collaborates with patients, families and outpatient professionals to develop a post-discharge plan of care that addresses each patient's distinctive medical, psychological and situational challenges to protect their recovery." ERC represents to the general public that, "… programs are designed to address eating disorders as they occur with psychiatric disorders including anxiety, bipolar disorder, depression and addiction…" ERC represents that its treatment philosophy emphasizes through assessment, innovative evidence based interventions and comprehensive discharge planning to support lasting recovery outside of the structured treatment environment."

43. In truth and in fact, with regard to Plaintiff, ERC's treatment team placed an overemphasis on addictive, prescription, narcotic drugs which were not properly monitored and upon Plaintiff's discharge, were given to her in an unsupervised manner. ERC also did not effectively collaborate with Plaintiff's medical professionals on a post-discharge plan of care that addressed Plaintiff's serious, life threatening issues.

44. As such and to this end, ERC violated the CCPA in the following, but not limited to, particulars:

    A.    ERC knowingly made a false representation as to the characteristics . . . of services… ;

    B.    ERC represented that … services … are of a particular standard or quality… if it knew or should have known that it was of another;

    C.    ERC failed to disclose material information regarding its goods or services which was known at the time if such failure to disclose such information was intended to induce the consumer into a transaction.

45. ERC's deceptive trade practices occurred in the course of ERC'S business, vocation or occupation.

46. ERC's deceptive trade practices significantly impact actual or prospective consumers in the market for healthcare not only in the Denver metropolitan area but the State of Colorado and

the nation as well.  ERC's conduct was a producing cause of damages to Plaintiff in an amount to be determined by the jury at trial for which Plaintiff herein sues.  Such damages include, but are not limited to, past and future medical and health care bills, mental anguish, emotional distress, pain and suffering and other similar injuries and damages.

47.     Further, Defendant's conduct was committed in bad faith as that term is defined within the context of the statutory scheme and the Court should award additional damages pursuant to CCPA, C.R.S. § 6-1-113(2)(b).

48.     It was necessary for Plaintiff to retain the services of the undersigned attorney to pursue her rights and remedies in the case at bar.  As such, Plaintiff is entitled to recover all necessary and reasonable attorney's fees in an amount to be determined by the Court for which amount Plaintiff herein sues.

## REQUEST FOR TRIAL BY JURY

49.     Plaintiff hereby requests a trial by jury.

WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully requests that Defendants Miceli and ERC appear and answer herein and that the Court:

1. Assume jurisdiction over this case;
2. Grant to Plaintiff a trial by jury herein;
3. Award to Plaintiff judgment against Defendants, for the damages set forth hereinabove;
4. Award the costs of prosecution of this action to Plaintiff;
5. Award to Plaintiff from ERC reasonable attorney's fees for the prosecution of this action;
6. Award to Plaintiff such other and further relief, at law or in equity, to which Plaintiff may be justly entitled.

Respectfully submitted,

/s/ Steven R. Dunn_____
Steven R. Dunn
**Dunn Firm, P.C.**
8390 LBJ Freeway, Suite 540
Dallas, Texas 75243
Telephone (214) 692.5533
Facsimile (214)   692.5534

**ATTORNEY FOR PLAINTIFF**

## CERTIFICATE OF REVIEW

Pursuant to C.R.S. § 13-20-602(3)(a), the undersigned counsel hereby certifies as follows:

a. Counsel has consulted with licensed professionals with expertise in the areas of the alleged negligent conduct as set forth in Plaintiff's Complaint, including but not limited to, eating disorders, and;

b. The licensed professionals who have been consulted have reviewed all known facts, including such records, documents and other materials as found to be relevant to the allegations of negligent conduct as complained of in Plaintiff's Complaint;

c. Based upon such facts, the licensed professionals have concluded that the filing of the claims against the defendants do not lack substantial justification within the meaning of C.R.S. § 13-17-102(4); and

d. The licensed professionals who have reviewed all known facts relevant to the allegations of negligent conduct as contained in Plaintiff's Complaint meet the requirements set forth in C.R.S. § 13-64-401.

Respectfully submitted, this 13th day of November 2014.

/s/ Steven R. Dunn
Steven R. Dunn